UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15 CR 72 - PPS |
| | ) | |
| DARRICK VALLODOLID, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

In this racketeering prosecution, Darrick Vallodolid was convicted at trial for his participation in the Latin Kings street gang. His participation in the gang included the murder of a 16 year old boy who was riding through the neighborhood on his bike when Vallodolid shot and killed him thinking he was a rival gangster. Vallodolid now seeks a judgment of acquittal or, in the alternative, a new trial. [DE 1914]. No less then eight fellow Latin Kings testified at trial that Vallodolid was the local leader of the gang. The evidence against Vallodolid was plainly sufficient for a jury to determine he was guilty beyond a reasonable doubt. There was no miscarriage of justice, and neither an acquittal nor a new trial is warranted.

**Factual Background**

An eleven day jury trial was held before me in May 2018 against Vallodolid and his co-defendant, Robert Nieto. Vallodolid was found guilty of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), and in answer to a special interrogatory, the jury

unanimously found Vallodolid committed the murder of Victor Lusinski while committing or attempting to commit criminal gang activity and he conspired to distribute or possess with intent to distribute 5 kilograms or more of cocaine. [DE 1590.] Vallodolid was also found guilty of a drug conspiracy in violation of 21 U.S.C. § 846, and the jury found the offense involved the distribution of 5 kilograms or more of cocaine and 100 kilograms or more of marijuana. [*Id.*]

The evidence at trial showed that Vallodolid was a member of the Latin Kings, a Chicago-based street gang, with local sets or "hoods" in Hammond, Gary, and East Chicago. [Tr. 372-75, 458-59, 497, 543, 1025, 1053-54.] The Latin Kings are a highly organized street gang with a written manifesto, a distinct hierarchy and established rules. The evidence established that members of the Latin Kings committed acts of violence including murders, shootings, arsons, beatings to protect their territory, and they were involved in an extensive drug trade. [Tr. 375-76, 450, 482, 511, 1040-41, 1053, 1065-66, 1092-93, 1143-46, 1159, 1440, 2109, 2276.] The Kings had a common gang sign (a five-point crown) and a unique handshake that they called "shaking up the crown." [Tr. 391-92, 437-39, 476-79, 1033-34, 1092, 1376-77, 1393.] They showed disrespect to rival gang members by intentionally making that gang's sign upside down (known as "throwing down" the rival's sign). [Tr. 440-41.] The Latin Kings were required to pay dues which went to purchase drugs for resale, firearms, ammunition, and pay attorney fees and bond money for incarcerated members. [Tr. 491, 1345, 1418, 1673.]

Vallodolid rose in the ranks to the position of the Inca, which was the leader of

2

the local King set. [Tr. 463-69, 498, 501-03, 1040-41, 2260, 2269.] Eight Kings testified against Vallodolid at trial, identifying him as an Inca of the Hammond 148th Street set of the Kings, and testifying that they saw him sell drugs, carry guns, post up and patrol his territory, collect and deliver gang dues, order and participate in beatings for rule violations and initiations into the gang, give orders for others to commit acts of violence, shoot at a house and a car, and shake up the crown. [Tr. 531-35, 858-66, 1170-88, 1254-64, 1357-74, 1378-84, 1684-86, 1689-90, 1693, 1757, 1762-66, 2251-52, 2269, 2271-83, 2288-93.] There was also evidence that Vallodolid shot and killed 16 year old Victor Lusinski believing him to be a rival gang member. [Tr. 892-97, 894-95, 921-22, 927-28, 1387-88, 1390-95, 1557, 1568-70, 1769-72.] The jury found in its answers to a special verdict form that the murder of Lusinski was done both with the intent to benefit the Latin Kings and to increase Vallodolid's standing in the Kings. [DE 1948 at 51-52; DE 1590].

## Discussion

### **Rule 29 Motion**

Federal Rule of Criminal Procedure 29(c) provides that a defendant may renew a motion for judgment of acquittal after a guilty verdict, and "the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1), (2). Thus, Vallodolid may renew his motion even though this Court already denied a previous motion (made during trial at the end of the Government's case). [DE 1579.]

In ruling on a motion for acquittal, the Court must determine whether, at the

3

time of the motion, there is relevant evidence from which a jury could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government. *See United States v. Studley*, 892 F.2d 518, 526 (7th Cir. 1989); *see also United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010). The Court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (quotation omitted). The inference of guilt of a criminal offense may be created by either direct or circumstantial evidence, and circumstantial evidence is of equal probative value to direct evidence. *Studley*, 892 F.2d at 526. All reasonable inferences that can be drawn from the evidence are viewed in the light most favorable to the Government. *Id.*

Under Rule 29, a defendant like Vallodolid faces "a nearly insurmountable hurdle" since this Court will "defer to the credibility determination of the jury and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014); *see also United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008) (courts defer to the jury's credibility determinations).

Vallodolid first argues that the Government failed to prove he was part of an enterprise. For the Government to prove Vallodolid guilty in violation of 18 U.S.C. § 1962(d), it had to establish: (1) Vallodolid knowingly conspired to conduct or participate in the conduct of the affairs of the Latin Kings, an enterprise, through a pattern of

4

racketeering activity, as described in the superseding indictment; (2) the Latin Kings were an enterprise; and (3) the activities of the enterprise affected interstate commerce. *See United States v. Olson*, 450 F.3d 655, 664, 668-69 (7th Cir. 2006).

Vallodolid argues that the testimony merely established "the group of people Vallodolid associated with were no more than acquaintances who occasionally acted together." [DE 1914 at 2.] This argument is way off base. An enterprise includes any association or group of individuals associated in fact. 18 U.S.C. § 1961(4). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). While the central element of an enterprise is structure, the Seventh Circuit has held that with informal organizations such as criminal groups, there "must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) (quoting *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994)). Indeed, the Latin Kings have been found by many courts to constitute an enterprise. *See, e.g., United States v. Amaya*, 828 F.3d 518 (7th Cir. 2016); *Olson*, 450 F.3d 655; *United States v. Tello*, 687 F.3d 785 (7th Cir. 2012); *United States v. Guzman*, No. 08 CR 746-11, 2011 WL 4702186 (N.D. Ill. Sept. 29, 2011) (denying motions under Rule 29 and Rule 33).

In this case, the jury heard ample evidence that the Latin Kings were a group of people associated together for a common purpose – they were a hierarchy organized by a set of rules and a written Manifesto, they paid dues and had set practices regarding

5

initiation, attending meetings, and engaging in violence in the name of the gang, and they acted together to sell drugs and hold down their territory. Multiple witnesses testified about the structure of the Latin Kings, the hierarchy, and the fact that Vallodolid worked his way up to become a leader, and was the Inca for a number of years. The evidence showed that the Latin Kings shared money, drugs, and the power associated with being gang members. Viewing the evidence in the light most favorable to the Government, it is clear that a rational trier of fact could have found that the Latin Kings was a RICO enterprise.

Additionally, Vallodolid argues that even if the Government established the Latin Kings enterprise existed, the evidence was insufficient to show Vallodolid was an actual member of the enterprise. [DE 1914 at 3.] It is true that Alexander Vargas, who was a high ranking Latin King from Chicago with 1,000 Kings under his control, did not recognize Vallodolid's name [Tr. 1038, 1112]. But just because Vargas did not know Vallodolid does not mean he was not a King. It's not like Vargas testified affirmatively that Vallodolid was *not* a King. Rather, he just didn't know one way or the other. On the other side of the evidentiary scale was the testimony of eight Latin King witnesses — Jose Sanchez, Josh Roberts, Jason Brown, Raphael Cancel, Keith Manuel, Juan Alcaraz, Timothy Diaz, and Aldon Perez — who all testified that Vallodolid had his crown and was a member of the Latin Kings. What's more, the evidence showed that Vallodolid engaged in the gang activity by dealing at least four kilograms of cocaine, shooting at houses and cars, and ordering others to burn a car. [Tr. 1380-83, 2278-79.] In

6

sum, there was plenty of evidence from which a reasonable jury could conclude that Vallodolid was a member of the Latin Kings.

Vallodolid's next main argument is the Government failed to prove that Vallodolid committed the first-degree murder of Lusinski, and failed to prove that Vallodolid committed the murder to maintain or increase his position in the Latin Kings enterprise. [DE 1914 at 4.] In making this contention, Vallodolid attacks the credibility of the cooperating witnesses — Joshua Roberts, Raphael Cancel, Keith Manuel, Juan Alcaraz, and Tim Diaz. [*Id.* at 5-15.] But as frequently said, Vallodolid's already "heavy burden in the judgment of acquittal context - in which a verdict will be affirmed if *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt - 'becomes even heavier' where he is attempting to show insufficient evidence based on the unreliability of witnesses." *United States v. Zambrana*, No. 2:00 CR 28 TS, 2005 WL 1799525, at *3 (N.D. Ind. July 26, 2005) (emphasis in original) (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir. 1988)). The only extremely narrow exception to the rule that issues of witness credibility are relegated to the jury "can be invoked only where the testimony contradicts indisputable physical facts or laws." *United States v. Kuzniar*, 881 F.2d 466, 470-71 (7th Cir. 1989); *see also United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir. 1989) ("[m]ere inconsistencies in the witness's testimony do not render it legally incredible."). No such testimony was presented in this case.

Vallodolid contends these witnesses are unreliable because they were drug

abusers, impeached on dates, locations, and other details, received a reduced sentence or were not charged with any crimes in return for their testimony, and some details of the testimonies conflicted or were inconsistent. The Seventh Circuit is very clear that these types of arguments about witness credibility are not sufficient to receive a judgment of acquittal. Indeed, a jury is entitled to credit testimony even if it is "totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant." *United States v. Johnson*, 729 F.3d 710, 716 (7th Cir. 2013) (internal quotation omitted). A judgment of acquittal "is not required because the government's case includes testimony by an array of scoundrels, liars and brigands." *United States v. Grandinetti*, 891 F.2d 1302, 1307 (7th Cir. 1989) (quotation omitted).

It is not my role, but rather that of the jury, to consider the witnesses' motives and credibility, and it is their job to review the credibility of a witness testifying pursuant to a plea agreement, with a criminal background, and with attending possible biases. *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992). All of these witnesses were cross examined at trial and all of these potential deficiencies in their testimony were brought out. It was up to the jury to sift through the evidence and determine how much weight to give their testimony. To assist them in that process, the jury was instructed about inconsistent statements, how to evaluate the testimony of the witnesses who were promised certain benefits in return for their testimony and cooperation with the government, that Manuel was convicted of providing false

information to a law enforcement officer, and that Sanchez, Manuel, Cancel, Brown, Alcaraz, Diaz, and Perez pled guilty to one or more of the crimes that Vallodolid was charged with committing. [DE 1948, at 12-13.] The jury was instructed to treat the testimony from these fellow gang members "with caution and great care." [*Id.* at 13.]

Vallodolid makes a special point concerning the testimony of co-conspirator Manuel. He tells me that Manuel's "demeanor alone should have been enough to dismiss his testimony." [DE 1914 at 9.] Yet the jury witnessed his demeanor on the stand and was in the best position to either credit or discredit his testimony. Manuel's testimony certainly wasn't incredible as a matter of law — it didn't violate the laws of nature, for example. *See, e.g., United States v. Alcantar*, 83 F.3d 185, 189-90 (7th Cir. 1996).

There was sufficient evidence introduced at trial for the jury to find that Vallodolid committed the murder of Lusinski. On April 12, 2009, between 5 and 6 p.m., 16 year-old Victor Lusinski was killed by a .22 caliber gunshot wound to the head on the southeast corner of Truman Street just south of Columbia Elementary School in Hammond. [Tr. 774-76, 780, 783, 1240, 1736, 2197-98, 2200.] The shot was determined to be taken at fairly close range, a bicycle was tangled in his feet, and no shell casings were recovered from the scene. [Tr. 772-73, 745-46, 783.]

Former Latin King Josh Roberts testified that he received a call from Vallodolid on the day of the murder, stating Vallodolid left an object in Roberts' car in between the seat and driver's door. [Tr. 871-73, 1576, 2571-72.] Roberts looked in that spot and found a revolver, which may have been a .22 caliber. [Tr. 873, 899.] At Vallodolid's

9

request, Roberts removed the rubber bands from the revolver's handle and flushed them down the toilet, then hid the firearm in his basement crawlspace until Vallodolid returned later that evening to pick up the gun. [Tr. 886-91.]

A few days later, fellow gang member Vasquez and Vallodolid told Roberts that Vallodolid had shot a kid off a bike whose hat pointed in the wrong direction (signifying a rival gang membership), and Roberts understood this to mean the Lusinski murder. [Tr. 892-97, 895, 921-22.] When Vasquez told Vallodolid he should have fought the kid instead of shooting him, Vallodolid's response was something to the effect of, "we're Latin Kings; this is our neighborhood. We are not going to let nobody come over here" and Roberts testified that Vallodolid said, "[w]hy would I fight him if I have a gun?" [Tr. 892-97, 894, 897, 927-28.] After the murder, Vallodolid started calling himself and going by the nickname "Deuce" or "Deuce Deuce," which Roberts understood to mean twenty-two, as in .22 caliber. [Tr. 603, 898-900, 929, 1390.]

Additionally, former Latin King Keith Manuel testified that when he was released from prison in 2010, Vasquez and another King bragged to him about how Vallodolid was protecting his neighborhood and shot at a rival Two-Six gang member on a bike. [Tr. 1387-88.] Vallodolid himself told Manuel that he shot a Two-Six on a bike with his hat turned the wrong direction, and then took the gun to Roberts' house after the murder. [Tr. 1390-95, 1568-70.] Trial Exhibits 14A and 14B are photos taken the same day of the conversation showing Manuel and Roberts holding a .22 revolver and posing with Vallodolid. [Ex. 14A-B; Tr. 1391-93.] Vallodolid stated that he should

10

have been the one holding the .22 revolver because his nickname is "Deuce," the .22 caliber is his specialty, and he talked about the day he shot the Two-Six off the bike, including that there were no shell casings (meaning a revolver was used). [Tr. 1391-95, 1569-70.] Manuel spent a lot of time with Vallodolid as a King, and Vallodolid told Manuel about committing the murder on a number of occasions. [Tr. 1557.]

Other King members testified against Vallodolid as well about Lusinski's murder. For example, Diaz testified that Vallodolid told him Vallodolid caught a rival Two-Six member on a bike, shot him, and then put the gun at Roberts' house. [Tr. 1769-72.] Cancel likewise testified that Vallodolid told him he shot a Two-Six. [Tr. 1265-67.]

Although there were three eyewitnesses to the shooting, all were ten or eleven years old at the time, and were on a playground which was found to be at least 179 feet away from the murder. [Tr. 784-85, 792, 823, 2541.] The jury heard the testimony of the eyewitnesses, which was riddled with inconsistencies, and was entitled to either credit or discredit it.

In sum, there was sufficient evidence introduced at trial that Vallodolid committed the murder of Lusinski to increase his presence and worth in the Latin Kings gang. And reasonable jurors could have concluded that the testimony of the other Latin King witnesses was credible. *United States v. Jarrett*, 447 F.3d 520, 530 (7th Cir. 2006) ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . . ."). For these reasons, Vallodolid is not entitled to a judgment of acquittal.

**Rule 33 Motion**

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted). A district court may "weigh evidence, evaluate credibility, and grant the motion if the substantial rights of the defendant have been jeopardized." *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004) (citation omitted), *vacated on other grounds*, 546 U.S. 12 (2005).

In contrast to a motion under Rule 29, for Rule 33, a district court is not required to view the evidence in a light most favorable to the Government, but rather must independently consider the evidence presented. *Id.* The standard for granting a new trial under Rule 33 is less strenuous than the standard for granting a motion for judgment of acquittal under Rule 29(c). *See United States v. Alanis*, 265 F.3d 576, 591 n. 8 (7th Cir. 2001). Nevertheless, granting a Rule 33 motion is disfavored except in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1988) (quotations omitted). The court may only order a new trial if "the verdict is against the manifest weight of the evidence" and would result in a "miscarriage of justice." *United States v. Washington*, 184 F.3d 653, 657-58 (7th Cir. 1999).

In his initial motion, Vallodolid spent approximately one page just listing reasons for a new trial. [DE 1914 at 13-14.] This laundry list of supposed errors contains not one citation to the record, not one citation to a case, and no legal analysis at

all. In response, the Government argues that the issues in the Rule 33 portion of Vallodolid's motion are waived. *See United States v. Cantrell*, No. 2:07-cr-44, 2008 WL 4998370, at *6 (N.D. Ind. Nov. 20, 2008) (denying motion for new trial on basis that "[d]efendant's four-paragraph Rule 33 motion, which does not contain a single legal citation, fails to meet his responsibility of developing arguments and presenting grounds to grant the relief requested."). I agree.

Although Vallodolid briefly touches on developing some of these arguments slightly in the reply memorandum, this is too late because the Government did not have an opportunity to respond. *Nelson v. LaCrosse Cnty. Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002). An argument that is neither developed nor supported until the filing of a reply brief does not warrant consideration. The Seventh Circuit has held that this "is too little, too late." *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *see also Wiegard v. Smith*, No. 04-419-CJP, 2007 WL 853982, at *2 (S.D. Ill. Mar. 19, 2007) (denying motion for new trial where "defendant's motion consists primarily of a laundry list of perfunctory points, none of which serve to demonstrate grounds for a new trial."); *United States v. Andry*, No. 13 CR 843, 2015 WL 13439795, at *1 (N.D. Ill. Sept. 28, 2015) ("the laundry list of errors are not developed so the objections are waived.").

As such, I consider the arguments under the Rule 33 motion for a new trial waived. Even if the arguments are not deemed waived, I have reviewed Vallodolid's motion for a new trial, and it would fail on the merits in any event. Vallodolid has come nowhere near meeting his heavy burden of showing that the verdict is so contrary

to the weight of evidence, that a new trial is required in the interest of justice. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).

Finally, Vallodolid argued in his initial motion that in response to him rejecting the Government's offer to plea on the RICO conspiracy, the Government then charged Vallodolid with the Lusinski murder. [DE 1914 at 14; DE 1974 at 10.] Vallodolid contends this was an improper punishment for Vallodolid exercising his right to trial. *Id.* The Government responds that it did not have sufficient information to charge Vallodolid with the murder at the time it offered the first plea in August 2016, and that even after the indictment was superseded and Vallodolid was charged with the murder, it still engaged in plea negotiations with him. [DE 1937 at 22.]

Although Vallodolid requests a hearing on this matter, to obtain an evidentiary hearing on a prosecutorial vindictiveness claim, Vallodolid needs to show he "offered sufficient evidence to raise a reasonable doubt that the Government acted properly in seeking the superseding indictment[]." *United States v. Tingle*, 880 F.3d 850, 856 (7th Cir. 2018) (quotation omitted). Although in some instances prosecutorial misconduct can be presumed, "the Supreme Court has refused to extend the presumption of vindictiveness to pre-trial prosecutorial conduct." *United States v. Spears*, 159 F.3d 1081, 1086 (7th Cir. 1998) (citing *United States v. Goodwin*, 467 U.S. 368, 384 (1982)). Here, Vallodolid has not offered any evidence to raise a doubt as to whether the Government acted properly in this case. It is perfectly permissible for the Government to "threaten[] a defendant with increased charges if he does not plead guilty, and follow[] through on that threat if the

14

defendant insists on his right to stand trial." *Tingle*, 880 F.3d at 856 (quoting *Alabama v. Smith,* 490 U.S. 794, 802 (1989)). As such, this argument is also unavailing.

**Conclusion**

For the reasons set forth above, Defendant, Darrick Vallodolid's motion for a judgment of acquittal and new trial [DE 1914] is DENIED.

SO ORDERED.

ENTERED: April 16, 2019.

    /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT