UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 2:15 CR 72 - PPS |
| DARRICK VALLODOLID, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

I denied Darrick Vallodolid's motion for a judgment of acquittal or, in the alternative, a new trial. [DE 1914, 1986.] Vallodolid has now filed a Motion to Supplement Motion for New Trial. [DE 2300.] He argues there is new evidence that cooperating co-defendant Keith Manuel (who testified against Vallodolid at trial), lied about the meaning of the teardrop tattoo on his face. According to Vallodolid, Manuel's lie about his tattoo justifies a new trial.

Darrick Vallodolid was convicted after an eleven day jury trial in this racketeering prosecution for his participation in the Latin Kings street gang. His involvement included the murder of a 16 year old boy (Victor Lusinksi) who was riding through the neighborhood on his bike when Vallodolid shot and killed him thinking he was a rival gangster. Keith Manuel was not the only Latin King who testified against Vallodolid at trial. As I set out in my earlier opinion, at least eight fellow Latin Kings testified. [DE 1986 at 1.] The evidence against Vallodolid was plainly sufficient for a

jury to determine he was guilty beyond a reasonable doubt, and this new evidence about the meaning of Manuel's teardrop tattoo or when he got the tattoo does nothing to alter the substantial evidence produced against Vallodolid at trial. Because this new evidence is not material, there is virtually no chance that the jury would have reached a different conclusion had it known that the testimony was false — if it is false at all. The motion is denied.

## Factual Background

I already set out the facts at length in this case in my order denying the motion for new trial. [DE 1986 at 1-3.] Therefore, I'll concentrate on the facts relevant to this new motion but I won't rehash everything I have already set out in my previous order.

Keith Manuel was a former Latin King Inca who testified against Vallodolid at trial. [Tr. 1436.] Manuel testified about the general rules and practices of the Latin Kings. [Tr. 1337-53, 1416-17.] At trial he also testified about Vallodolid's personal involvement in the gang, including how he ordered violations, initiated others into the Kings, possessed firearms, sold drugs, and shot at people. [Tr. 1357-74.] Manuel testified about statements he heard from others that Vallodolid was involved in the murder of Victor Lusinksi. [Tr. 1387-88.] Vallodolid himself told Manual that he shot a Two-Six (or a rival gang member) on a bike with his hat turned the wrong direction, and then took the gun to Roberts' house after the murder. [Tr. 1390-95, 1568-70.] Manuel spent a lot of time with Vallodolid as a Latin King, and Vallodolid told Manuel about committing the murder on a number of occasions. [Tr. 1557.]

2

Manuel was not the only person who testified about the Lusinksi murder. Former Latin King Josh Roberts testified that he received a call from Vallodolid on the day of the murder, stating Vallodolid left an object in Roberts' car in between the seat and driver's door. [Tr. 871-73, 1576, 2571-72.] Roberts looked in that spot and found a revolver, which may have been a .22 caliber. [Tr. 873, 899.] At Vallodolid's request, Roberts removed the rubber bands from the revolver's handle and flushed them down the toilet, then hid the firearm in his basement crawlspace until Vallodolid returned later that evening to pick up the gun. [Tr. 886-91.]

A few days later, fellow gang member Vasquez and Vallodolid told Roberts that Vallodolid had shot a kid off a bike whose hat pointed in the wrong direction (signifying a rival gang membership), and Roberts understood this to mean the Lusinski murder. [Tr. 892-97, 895, 921-22.] When Vasquez told Vallodolid he should have fought the kid instead of shooting him, Vallodolid's response was something to the effect of, "we're Latin Kings; this is our neighborhood. We are not going to let nobody come over here" and Roberts testified that Vallodolid said, "[w]hy would I fight him if I have a gun?" [Tr. 892-97, 894, 897, 927-28.] After the murder, Vallodolid started calling himself and going by the nickname "Deuce" or "Deuce Deuce," which Roberts understood to mean twenty-two, as in .22 caliber. [Tr. 603, 898-900, 929, 1390.]

At Vallodolid's trial, his defense attorney cross-examined Manuel for more than 100 pages of trial transcript, and he then conducted a re-cross that covered another 14 pages. [Tr. 1482-1594, 1645-59.] The jury heard that Manuel had a prior conviction for

3

lying to the police [Tr. 1485] and he forgot about that conviction [Tr. 1482-83], that he was a longtime, high-ranking gang member [Tr. 1537-38], and that he shot at someone's house more than 100 times [Tr. 1552-56]. The attorney impeached Manuel with the fact that Manuel pled guilty to murder and was facing life in prison. [Tr. 1487, 1506-08.] Counsel also elicited testimony that Manuel was receiving benefits for his plea such as points for acceptance of responsibility, the government's recommendation for a sentence at the low end of the Guideline range, a 30-year sentencing cap, and a potential 5K motion for downward departure. [Tr. 1506-14.] The cross-examination also included counsel showing Manuel video recordings of his multiple proffers, and impeaching Manuel with accusations that he lied to law enforcement or withheld information during those proffers, and highlighting areas where Manuel's trial testimony differed from the proffers. [Tr. 1490, 1495-97, 1501, 1504, 1537, 1551, 1559-60.] Additionally, counsel elicited testimony that Manuel did drugs and had diagnosed psychological conditions. [Tr. 1565, 1568, 1579-80.]

At Vallodolid's trial, defense counsel asked Manual about the several tattoos on his face. [Tr. 1530-37.] Manuel answered that he had a "teardrop." [Tr. 1531-32.] When questioned, "[w]hat's that teardrop for?" Manuel answered, "[t]his represent my mom died since I been locked up." [*Id.*] When asked if teardrops mean anything else, Manuel stated, "[t]he ones that are shaded in mean you kill somebody, and the ones that are not shaded in mean you lost somebody you love." [Tr. 1532.]

Manuel had been in and out of jail, and then was continuously incarcerated from

the end of 2014 until his testimony at trial. [Tr. 1517-21, 1529.] According to Manuel's booking photo from December 2014, he did not have a teardrop tattoo near his eye at that point in time. [DE 2334-2 at 1.] A photo in December 2015 shows that Manuel did have an empty teardrop tattoo near his left eye. [DE 2334-2 at 2.] And a booking photo from August 2019, about 14 months after the trial testimony, shows the same empty teardrop tattoo near Manuel's left eye. [DE 2334-2 at 3.]

Before turning to the analysis of this motion, I note that Vallodolid previously made a point of criticizing Manuel's testimony, arguing his "demeanor alone should have been enough to dismiss his testimony." [DE 1914 at 9.] I already addressed and dismissed this argument, finding the jury witnessed Manuel's demeanor on the stand and was in the best position to either credit or discredit his testimony. [DE 1986 at 9.] Moreover, Manuel's testimony certainly wasn't incredible as a matter of law — it didn't violate the laws of nature, for example. *See, e.g., United States v. Alcantar*, 83 F.3d 185, 189-90 (7th Cir. 1996); *United States v. Kuzniar*, 881 F.2d 466, 470-71 (7th Cir. 1989) (the only narrow exception to the rule that issues of witness credibility are relegated to the jury "can be invoked only where the testimony contradicts indisputable physical facts or laws."). I also already noted that the cooperating witnesses, including Manuel, were "examined at trial and [the] potential deficiencies in their testimony were brought out," and the jury was instructed that "Manuel was convicted of providing false information to a law enforcement officer, and that . . . Manuel pled guilty to one or more of the crimes that Vallodolid was charged with committing." [DE 1986 at 8-9.]

5

I sentenced Keith Manuel on September 9, 2019, approximately 16 months after the Vallodolid jury verdict. During the sentencing hearing, I made a comment about Manuel's difficult background and mentioned, "[y]our mom gets murdered when you're four years old in an armed robbery, I believe it was reflected in the report." [Manuel Sent. Tr. 2279 at 22.] I also discussed how significant Keith Manuel's cooperation was in this case, and indeed, it was vast. He was partly responsible for making cases on dozens of gang members, and that entitled him to substantial consideration at sentencing, in my judgment. As for his testimony in the Vallodolid trial, I found it to be persuasive, convincing, and important in obtaining a conviction. I elaborated:

> [T]o me you were among the best cooperators I've ever seen. Your testimony was super persuasive because it was matter of fact. It oozed with credibility. I found it totally believable. . . . Then you testified in the Vallodolid trial and Nieto trial. You were a pivotal witness in that trial. That's a tough case for the government. I think I can fairly say that was a difficult case for the government. It was a terrible murder, in my judgment. This kid just gets shot, for no good reason, dead. And you had critical information about that, and your testimony, I think, really sealed, certainly, Vallodolid's fate. It was really persuasive testimony.

Manuel Sent. Tr. at 23-24.]

## Discussion

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial grounded on newly discovered

6

evidence must be filed within 3 years after the verdict or finding of guilty, thus this motion is timely.  Fed. R. Crim. P. 33(b)(1).

Granting a Rule 33 motion is disfavored except in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quotations omitted).  "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly."  *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted).  The court may only order a new trial if "the verdict is against the manifest weight of the evidence" and would result in a "miscarriage of justice."  *United States v. Washington*, 184 F.3d 653, 657-58 (7th Cir. 1999).

The requirements that are generally applied to Rule 33 motions based on newly discovered evidence are that the evidence: "(1) came to light after trial; (2) could not with due diligence have been discovered earlier; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal."  *United States v. Austin*, 103 F.3d 606, 608-09 (7th Cir. 1997); *see also United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007).  Where a motion for a new trial is based on allegedly false testimony, courts conduct a "more focused" analysis that considers whether: (1) the court is reasonably well satisfied that the testimony given by a material witness is false; (2) the jury might have reached a different conclusion absent the false testimony or if it had known that the testimony by a material witness was false; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.  *United States v. Bender,* 539

F.3d 449, 456 (7th Cir. 2008); *see also Austin*, 103 F.3d at 609.

Vallodolid has failed to carry his burden on either of these inquiries (the general test for newly discovered evidence and the more focused inquiry for false testimony). *See Bender*, 539 F.3d at 456. The first question for this Court under the more focused analysis is whether Manuel's trial testimony was actually false. *Austin*, 103 F.3d at 609 (holding the court should only apply the false testimony analysis if it is "reasonably well satisfied" that a material witness testified falsely). Manuel stated that the teardrop tattoo "represent[s] my mom died since I been locked up." [Tr. 1532.] It came out during Manuel's sentencing that his mother died when he was a minor, so Vallodolid argues "[t]here can be no doubt" that Manuel's statement must be false. [DE 2300 at 3.] The government contends that there is more than one way to interpret what Manuel said. In looking at the booking photos, Manuel did not have the tattoo in late 2014, but had it by December 2015, so he must have gotten the tattoo at some point when he was in prison. If you break his statement up, Manuel's statement that he got the tattoo "since I been locked up" could be true. His testimony could be read as saying the tattoo "represent[s] my mom died" and that he got the tattoo "since I been locked up." There would be nothing false about that statement. *See United States v. Daal Wyk*, 840 F.2d 494, 500 (7th Cir. 1988) (statement not false when "discrepancy could have resulted . . . from miscommunication"); *United States v. Ogle*, 425 F.3d 471, 478 (7th Cir. 2005) (affirming denial of motion where "nothing in [witness'] statements conclusively establishes that he perjured himself."). But I'm not sure the government's reading of Manuel's

8

statement about his teardrop tattoo is plausible.  It seems to me that the more commonsense reading of the statement in its entirety is that Manuel's mother died when Manuel was in jail, and the teardrop tattoo represents his mother.

Even assuming Manuel's statement about his teardrop tattoo is false (because his mother died years earlier, not when Manuel was in jail), a new trial is still not warranted.  I think this evidence is both impeaching and cumulative, but not material, and I don't think a jury might have reached a different conclusion had it known that the testimony by Manuel was false.  If anything, that Manuel lied about his tattoo could be relevant to show he was an untrusty criminal himself, but Vallodolid's counsel already cross examined Manuel at length, and the jury already heard plenty of evidence of Manuel's involvement with the Latin Kings and the many bad acts Manuel committed as part of his involvement with them.  Although Vallodolid argues that Manuel was "never caught in a clear lie" before this [DE 2349 at 4], defense counsel impeached Manuel for hours, noting inconsistent statements, his drug use, that he had lied in previous proffers, that he shot at someone's house 100 times, and that he was a cooperating witness who was testifying pursuant to a plea agreement.  It is therefore unlikely that one more piece of evidence about Manuel's truthfulness would sway a jury to such an extent to acquit Vallodolid of the charges against him.

This seems even more so since Manuel was not the only witness to testify against Vallodolid.  *See United States v. DePriest*, 6 F.3d 1201, 1217 (7th Cir. 1993) (determining that newly discovered impeachment evidence did not warrant a new trial because the

conviction "was not premised on the demonstrably dubious testimony of a single witness"); *see also United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008). "Because [Vallodolid] did impeach [Manuel] on a number of issues, they can't really make a convincing argument that additional impeachment had a reasonable probability of changing the outcome of the trial." *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) (*abrogated on other grounds*); *see also Bender*, 539 F.3d at 456 ("the coconspirators were vigorously cross-examined about the motivations and incentives for their testimony, including their desire to obtain reduced sentences. [New evidence], even if accepted at face value, would have been cumulative impeachment evidence, generally insufficient to warrant a new trial." If Manuel truly did give false testimony about when he got his teardrop tattoo or what it meant, this "minor contradiction[]" would not have swayed the verdict. *Austin*, 103 F.3d 606, 609 (7th Cir. 1997). Manuel was an important witness at Vallodolid's trial, but the cumulative evidence against Vallodolid was also persuasive.

Vallodolid speculates that Manuel's false testimony about his teardrop not only could have damaged Manuel's credibility, but that it also gives rise to the "obvious conclusion . . . that [the tattoo] represents a murder that he committed." [DE 2300 at 5.] This conjecture does not even make sense. Manuel testified that a filled in teardrop represents a murder committed by that person, but an empty teardrop means that the person lost a loved one. Here, the pictures indisputably show that Manuel's teardrop was empty. If anything, then, the teardrop means Manuel lost a loved one, and could

10

support the conclusion that he got the teardrop in memory of his mother - not that Manuel himself committed a murder.

In this case, even if I take Manuel's testimony as false, it was not material evidence, and I don't think the jury might have reached a different conclusion had it known that this testimony by Manuel was false.

## Conclusion

For the reasons set forth above, Defendant Darrick Vallodolid's Motion to Supplement Instanter Motion for New Trial [DE 2300] is DENIED.

SO ORDERED.

ENTERED: October 29, 2019.

                                           /s/   Philip P. Simon  
                                           PHILIP P. SIMON, JUDGE  
                                           UNITED STATES DISTRICT COURT